DEJA VU, INC., Plaintiff,

v.

SPOKANE COUNTY, Defendant.

No. CS–98–040–FVS.

United States District Court,
E.D. Washington.

Nov. 18, 1998.

Jack Ross Burns, Law Office of Jack R. Burns PS, Bellevue, WA, for Deja Vu–Spokane Inc., a Washington Corporation, plaintiff.

Patricia M. Connolly Walker, Spokane County Prosecuting, Attorney's Office, Spokane, WA, for Spokane County, defendant.

## ORDER

VAN SICKLE, District Judge.

**BEFORE THE COURT** is plaintiff's motion for partial summary judgment, defendant's cross-motion for summary judgment, and plaintiff's motion to strike. Plaintiff is represented by Jack R. Burns; defendant by Patty Connolly Walker. These matters were considered without oral argument. This Order will memorialize the Court's rulings.

### Background

On November 4, 1997, Spokane County enacted Ordinance No. 97–1052 regulating establishments offering nude and semi-nude dancing. This worked wholesale operational changes by imposing license requirements, closure hours, minimum lighting criteria and other restrictions. The provision generating the most heat is the "four foot rule" which prohibits dancers and patrons from coming within that distance of one another. One might think that dancing would fall within the realm of the visual arts, but as the trade is practiced, the tactile arts are the real drawing card. Hence, the County's perceived need to distance the viewers from the viewed. For an overview of the considerations which lay behind such enactments, see *Kev, Inc. v. Kitsap County,* 793 F.2d 1053 (9th Cir.1986). Suffice it to say that the County was concerned with illegal sexual conduct occurring on the premises and the secondary effects of criminal activity in the surrounding area including prostitution and drugs.

This action followed on February 9, 1998 and challenges the enactment as a whole and 16 discrete provisions. Plaintiff moves for partial summary judgment on the following issues: (1) dancers should not be required to disclose their home addresses and phone numbers on licensing applications for personal security reasons; (2) pursuant to the Privacy Act, dancers need not disclose their social security numbers; (3) direct payment by customers to stage dancers should not be prohibited; (4) the closure hours do not serve a legitimate purpose; and (5) the ordinance is overbroad in that it may be read to prohibit nonobscene dancing. Defendant moves for full summary judgment both on the merits and on grounds of collateral estoppel.

### Summary

With one exception and one clarification, the ordinance is valid. The single exception is that the County has failed to establish a "substantial governmental interest" in licensing "peep show" devices as required by Ninth Circuit case law. Specifically, the County has failed to demonstrate a relationship between license requirements and the law enforcement costs associated with regulating the devices. The County might yet make that showing, but trial on the merits will be required to resolve the issue. The clarification is that the ordinance may not regulate the content of expression which is not obscene. However, the ordinance may regulate conduct that is obscene. The "dancing" regu-

lated by the ordinance in this case is conduct.

## Analysis

### I. County's motion for summary judgment

(A) Collateral estoppel: The record is impressive for its bulk and the issues are numerous and complex, but this is actually a simple case. It has been litigated,[1] and relitigated,[2] and relitigated[3] and relitigated.[4] For the most part, collateral estoppel bars this attempt to relitigate yet again. Judges Rothstein and Zilly of the Western District of Washington have already applied collateral estoppel; Judge Zilly based on the Bellevue litigation and Judge Rothstein based on both the Bellevue and Federal Way litigation. *Federal Way, supra,* at 3–6 (**Ct.Rec.19, Ex. G**); *Everett, supra,* at 4–9 (Ct.Rec.19, Ex. L). The King County Superior Court also applied collateral estoppel to all claims raised save for the "inevitable effects" issue. (**Ct.Rec.19, Ex. J**). Judge Rothstein pretty well summed it up in *Everett, supra.* "The repetitive litigation brought by Deja Vu only clogs the courts and wastes judicial time and resources." (**Ct.Rec. 19, Ex., L, page 9**).

 State rules on issue preclusion govern when applying state decisions. *Haphey v. Linn County,* 953 F.2d 549, 550 (9th Cir.1992) (en banc). Federal rules govern when applying federal decisions. *Trevino v. Gates,* 99 F.3d 911, 923 (9th Cir.1996), *cert. denied,* 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997). The Washington and federal rules differ in several respects, but parallel one another. The following elements must be satisfied to apply collateral estoppel under Washington law:

(1) the issue presented must be identical; (2) there must be a final judgment on the merits; (3) the party against whom collateral estoppel is asserted must have been a party to the former adjudication, or in privity with a party; and (4) no injustice will result by applying collateral estoppel.

*Garcia v. Wilson,* 63 Wash.App. 516, 518, 820 P.2d 964 (1991); *accord, Nielson v. Spanaway Gen. Med. Clinic,* 135 Wash.2d 255, 263, 956 P.2d 312 (1998).

Under the federal standard, to foreclose relitigation of an issue under collateral estoppel, three elements must be met: (1) the issue at stake must be identical to the one alleged in the prior litigation; (2) the issue must have been actually litigated [by the party against whom preclusion is asserted] in the prior litigation; and (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in the earlier action.

*Town of North Bonneville v. Callaway,* 10 F.3d 1505, 1508 (9th Cir.1993), quoting *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320 (9th Cir.1992).

 The distinguishing features between these two tests could yield differing results depending on the facts, but are not likely to here. The identity prong is the same. The "final judgment on the merits" prong necessarily assumes the issue was

---

1. *Ino Ino, Inc. v. City of Bellevue,* 132 Wash.2d 103, 937 P.2d 154 (1997) (plurality), *cert. denied,* —— U.S. ——, 118 S.Ct. 856, 139 L.Ed.2d 755 (1998). Deja Vu–Bellevue was a party in the case. *Dela–Vu–Bellevue, Inc. v. City of Bellevue,* No. 94–222796–3 (King County). (**Ct.Rec.19, ex. B**).

2. *Dela Vu–Everett–Federal Way, Inc v. City of Federal Way,* C95–1272Z (W.D.Wn.). Summary judgment in favor of defendant was granted on January 5, 1996. (**Ct.Rec.19, ex. G**). No appeal was taken.

3. *Deja Vu–Everett–Federal Way, Inc. v. City of Federal Way,* No. 97–2–14750–6KNT (King County). (**Ct.Rec.19, ex. I**). The action was dismissed on October 17, 1997 on a grant of summary judgment. (**Ct.Rec.19, ex. J**). The matter is on appeal.

4. *Deja Vu–Everett–Federal Way, Inc. v. City of Everett,* C98–147R (W.D.Wn.). (**Ct.Rec.19, ex. N**). Summary judgment was granted on June 16, 1998. (**Ct.Rec.19, ex. L**). No appeal was taken.

"actually litigated." *Nielson, supra,* 135 Wash.2d at 262, 956 P.2d 312 ("actually litigated by the parties and decided by a competent tribunal"); *Marriage of Murphy,* 90 Wash.App. 488, 498, 952 P.2d 624 (1998) ("actually litigated and necessarily determined in the prior action"). While the test as articulated by *Callaway, supra,* does not refer to privity, "party" also means those in privity. *United States v. ITT Rayonier, Inc.,* 627 F.2d 996, 1003 (9th Cir.1980); *accord, Pedrina v. Chun,* 97 F.3d 1296, 1302 (9th Cir.1996), *cert. denied,* 520 U.S. 1268, 117 S.Ct. 2441, 138 L.Ed.2d 201 (1997). Because of the strong parallels between the state and federal tests, they may be addressed simultaneously under the facts of this case without doing violence to either.

■ *(1) Identity of issues:* With two exceptions discussed at length below, every claim raised has either been abandoned in briefing or has previously been addressed in one or more of the four actions cited at notes 1–4, *supra.* (Ct. Rec.19, Ex. A). The legislative history underlying the various enactments will of course be different because the enacting communities were building on one another's litigation successes and because local conditions and concerns differ. A municipality may rely on legislative history created by other municipalities, as the County has done here. *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 51–52, 106 S.Ct. 925, 931, 89 L.Ed.2d 29 (1986); see (Ct.Rec.19, Ex. O, § II(C) (incorporating by reference the legislative records compiled by Bellevue and Federal Way). Thus, the fact that Spokane County's record differs from that of Bellevue, Federal Way and Everett has little significance. With one notable exception to be addressed further, the language of the enactments is essentially the same and the legal

issues posed, again with one major exception, are identical. *Compare* (Ct.Rec. 19, Exs. C, F, M & O).

■ *(2) Final judgment on the merits/actually litigated:* The four prior actions each went to final judgment. Summary judgment is a final judgment on the merits for issue preclusion purposes. *Steen v. John Hancock Mut. Life Ins. Co.,* 106 F.3d 904, 912 (9th Cir.1997); FRCP 41(b). As to the issues being actually litigated, while Judge Zilly applied collateral estoppel, he also reached the merits of the federal claims. *Federal Way, supra,* at 6–10 (Ct.Rec.19, Ex. G). Certainly the issues addressed in *Ino Ino* and in the proceedings below were actually litigated in a six-day trial.

*(3) Party or privity:* The findings by Judges Rothstein and Zilly on collateral estoppel are themselves collateral estoppel unless Deja Vu–Spokane is not a brother-sister corporation of Deja Vu–Everett–Federal Way and/or Deja Vu–Bellevue. It appears it is. Like the others, Deja Vu–Spokane shares a director,[5] management, corporate headquarters, registered agent and legal representation. (Ct.Rec. 19, Ex. K, pages 29–33). There is not much doubt on this. Deja Vu's FRCP 30(b)(6) designee so testified in deposition in the *Everett* matter. *Id.* Unlike the other cases, plaintiff here stands alone and has not brought in nominee plaintiffs in an attempt to escape issue preclusion as to those plaintiffs.[6] It also appears that all three corporations share significant common ownership, although this is not well documented in the record. *Id.* at 32–33.

Plaintiff argues that Deja Vu–Spokane had no financial stake in the outcome of the companion litigation, no standing to intervene in those actions, does not control any other Deja Vu entity nor do they

---

5. That is "director" singular. Each corporation has only one director, and she is the same person in each case.

6. Judge Rothstein rejected the nominees as legitimate plaintiffs under the "virtual repre-

sentative" doctrine. *Everett, supra,* at 5–6 (Ct.Rec.19, ex. L), citing *ITT Rayonier, supra,* 627 F.2d at 1003. Judge Zilly faced the same issue applying state law. *Federal Way, supra,* at 4–6 (Ct.Rec.19, ex. G).

control it, and the entities "scrupulously maintain[ ] their separate corporate identities." **(Ct.Rec. 31 (Declaration of Bern, ¶¶ 23–33))**. The second, third and fourth assertions are taken as true. The first is not. The subject ordinance came on the heels of *Ino Ino* and the Federal Way cases. Had the municipalities not been successful in those suits, it seems improbable that Spokane County would have launched a project doomed to failure. Plaintiff had a powerful prospective stake in the outcome of the companion litigation, and its "virtual representatives" did what they could to protect that stake.

*(4) Critical and necessary part of the judgment:* Plaintiff's privies thought the issues sufficiently critical and necessary to raise them in the complaints, and the various courts thought them critical and necessary enough to render rulings.

*(5) Injustice:* The only injustice asserted is that the ordinance will drive Deja Vu out of business. Economic impact is not a relevant factor in First Amendment analysis unless a regulation precludes entry into the market. *Kev, supra,* 793 F.2d at 1061; *Spokane Arcade, Inc. v. City of Spokane,* 75 F.3d 663, 666 (9th Cir.1996); *Colacurcio v. City of Kent,* 944 F.Supp. 1470, 1476 (W.D.Wash.1996). Plaintiff will still be able to operate and its dancers will still be able to express themselves artistically. If customers decline to come, or to pay as much for services, that is the marketplace at work. That is not a First Amendment concern. *Ino Ino, supra,* 132 Wash.2d at 131, 937 P.2d 154.

Plaintiff ought to take to heart Judge Rothstein's "clogging the courts" comment. With several notable exceptions to be addressed further, this action and those cited at notes 1–4, *supra,* are all the same case, brought by the same plaintiff, involving the same basic facts, the same issues and the same arguments. Only the identi-

ty of the defendant changes. Plaintiff should accept the fact that communities across the state are taking public lascivious sexual–conduct–for–cash seriously, and in a thus-far unbroken string, both state and federal Washington courts are in accord. The lawyer who represented Deja–Vu–Bellevue in the *Ino Ino* case argued to Judge Zilly in the *Federal Way* case that he should stay proceedings pending issuance of *Ino Ino* because the legal issues were "essentially the same." **(Ct.Rec. 19, Ex. G, pages 2–3)**. Indeed they are.

■ *(B) Merits:* As indicated, there are several issues which have not been disposed of in prior litigation. One is the licensing of panoram devices, and secondarily, the amount of the licensing fee.[7] A "panoram" is known colloquially as a "peep show." It is a device which allows a prospective viewer to deposit coins and then watch either a tape or live action in the privacy of a booth. *Acorn Investments, Inc. v. City of Seattle,* 887 F.2d 219, 220 (9th Cir.1989). Because such devices enjoy First Amendment protection, licensing must be justified by a "substantial governmental interest." *Id.* at 222. In *Acorn,* the governmental interest asserted was the cost of increased police surveillance and enforcement activities allegedly occasioned by the criminal element panorams are reputed to draw. Plaintiff contends that no such showing has been made here, and that even if a licensing requirement could be justified, the yearly fee of $150 per unit cannot be.

The County relies exclusively on *Spokane Arcade, supra,* for the premise that the issue has been foreclosed. The decision is not on point. *Spokane Arcade* held that economic disadvantage is irrelevant to First Amendment analysis in the face of a complaint that regulation renders activity less competitive within its marketplace; *i.e.,* more costly. 75 F.3d at 666. Rather,

7. The County contends that this is among the claims which have been abandoned. **(Ct.Rec. 35, page 20)**. This is not so. In its response, plaintiff argued that "no substantial reasons

exist for the licensing of panoram devices and that the fees are unrelated to the actual cost of inspections." **(Ct.Rec. 30, page 18)**.

the only relevant economic inquiry is whether regulation precludes entry into a marketplace. Plaintiff contends that logically, the same inquiry would be triggered in the face of a regulation that necessarily closes the marketplace to all comers.

The contention need not be reached, however, because the more fundamental issue is whether the County has demonstrated a substantial governmental interest in licensing the devices irrespective of the amount of fees charged. *Spokane Arcade* has eliminated any issue over whether panorams may be regulated as to time, place and manner. What police find objectionable about establishments offering such fare is that one may quickly slip from the street into a enclosed booth where drug deals, prostitution, and other unsavory acts can occur unseen. *Acorn, supra,* agreed this feature might promote adverse secondary effects. 887 F.2d at 222–24. What prompted *Acorn* to strike down Seattle's licensing scheme is that the City's ordinance had recently been amended to prohibit fully closed doors thus providing far less privacy and concurrently less opportunity for criminal activity. *Id.* With the decrease in opportunity for crime came a decrease in the need for law enforcement, and with the decrease in the need for enforcement action, the City's "substantial interest" evaporated.

The subject ordinance has similar configuration requirements. Pursuant to § X(B), booths and their occupants must be "fully and completely visible by direct line of sight to the manager located at the manager's station." Section IX(D)(3) places a duty on managers to monitor the booths. In light of these requirements, it is difficult to see how the devices themselves could promote either primary or secondary adverse effects. The County's FRCP 30(b)(6) designee could not articulate any nexus between the licensing requirement (and the fees imposed) and the enforcement of regulations governing the use of the panorams.

The County's William Benish thought the license itself was justified for administrative and accounting reasons; *i.e.,* if a facility were authorized to have a certain number of panorams, the number authorized ought to be written down somewhere. **Benish Dep. at 64–66 (Ct.Rec.10, Ex. 2).** While that makes a certain amount of sense, it is circular, because the rationale assumes at the outset that licensing is proper. Benish was unable to comment on an interrogatory answered on behalf of the County by someone other than himself that licensing could facilitate minimizing adverse secondary effects on the community. *Id.* at 68–69. He could not expand on any relationship between the charging of a fee and the control of secondary effects. *Id.* The licensing fee was based on an "educated guess," and was apparently arbitrarily arrived at because no one knew what the enforcement costs would be. *Id.* at 68–69. Once an inspection program was implemented, the county could then "see what the cost of implementing has actually come to be." *Id.* at 69. Benish testified that inspecting the panoram units to ensure they were authorized, and to inspect the booths for compliance with the physical configurations required by §§ IX(D)(3) and X(B) of the ordinance, would not take inordinately long.

A It should be relatively quick.

Q Like 30 seconds or a minute?

A Perhaps.

\*\*\*\*

Q Given the inspection may take as little as thirty seconds to a minute, or perhaps as much as say an hour if you find a missing device and have to talk to somebody about it, why is the fee set at $150 per device per year?

A I don't know specifically how that dollar amount is established.

*Id.* at 70–72.

On cross-examination, Benish agreed that inspection time on premises that had 50 units would be substantially longer than

premises that had only two. *Id.* at 112. That seems obvious, but it does not answer the question. The annual fee is assessed per unit, not per establishment. The record reveals no demonstrated correlation between the cost of enforcement and the license fee.

Benish believed the fee was also designed to cover the cost of inspecting the entire facility. *Id.* at 73. He did not break down inspection/administration time to any single application, but totalled "hours spent for all of the applications that will give us an average." *Id.* at 116. The entire facility already pays its own licensing fee. (Ct.Rec.10, Ex. 1, § XI(D)). A license fee is in the nature of a tax; a fee for service. In the First Amendment context, it must be justified by a substantial governmental interest. *Acorn, supra,* 887 F.2d at 222. The burden of showing that interest is on the regulating authority. *Id.* The County has not made that showing. On the present record, it appears that trial will be required to resolve: (1) whether a license can be justified in light of *Acorn;* and (2) if so, whether the fee charged can be justified.

## II. Plaintiff's motion for partial summary judgment

With one exception, the issues raised by plaintiff have been previously litigated.

*(A) Disclosure of home addresses and phone numbers:* The issue was litigated in the Bellevue and Federal Way cases. *Ino Ino, supra,* 132 Wash.2d at 123–25, 937 P.2d 154; *Federal Way, supra,* at 9–10 (Ct.Rec.19, Ex. G). Disclosure of this information has been determined to be a valid requirement.

*(B) Disclosure of social security numbers:* This disclosure requirement was

raised in both the Bellevue and Everett litigation, and two courts have now upheld it; albeit only the Everett case raised the federal Privacy Act claim. *Ino Ino, supra,* 132 Wash.2d at 123 n. 4 & 123–25, 937 P.2d 154; *Everett* at 9 (Ct.Rec.19, Ex. L).[8]

*(C) Direct payment by customers to stage dancers:* The issue has been litigated in the Bellevue and Everett cases. The Bellevue ruling did not find its way into the *Ino Ino* decision because it was not appealed. As observed by Judge Rothstein, however, it was litigated. *Everett, supra,* at 7–8 (Ct.Rec. 19, Ex. L; *see also,* Ex. D, concl. ¶ 34).

*(D) Closure hours:* The issue has been litigated in the Bellevue and Everett cases. *Ino Ino, supra,* 132 Wash.2d at 134, 937 P.2d 154; *Everett, supra,* at 7 (Ct.Rec.19, Ex. L).

■ *(E) Overbreadth (dramatic works exemption):* Plaintiff contends the "dramatic works exemption" may be read to prohibit nonobscene expression. What concerns Deja Vu is that an interrogatory answer made by the County suggests that this is how the provision will be read. (Ct.Rec. 10, Ex. 3, (interrogatory No. 14 and answer thereto)).[9] The exemption provides that the ordinance does not prohibit "Exhibitions, performances, expressions or dances that are not obscene." (Ct.Rec.19, Ex. O, § IX(B)(3)). Having just painted with a broad brush, the subsection goes on to take away what it just granted by providing further that the exemption does not "apply to sexual conduct defined in Section IV: of this ordinance or the sexual conduct described in RCW 48A.010(2)(b)(ii) and (iii) [*sic* ]."[10] (Ct.Rec.19, Ex. O, § IX(B)).

---

8. With the exception of a single issue reached on the merits, Judge Rothstein relied exclusively on issue preclusion. That does not alter the fact that the issues were litigated. It only means they were not litigated on the substantive merits.

9. In briefing, the County represents that this conclusion is a "misconstruction" of its answer. (Ct.Rec. 35, page 20 n. 6).

10. The citation should read 7.48A.010(2)(b)(ii) and (iii).

The reference to the statute is not a problem. It prohibits only obscenity.[11] RCW § 7.48A.010(2) ("lewd matter is synonymous with obscene matter.") The reference to § IV of the ordinance is more problematic because the term of art "sexual conduct" is defined to include conduct which may not necessarily be obscene. Of the five classes of acts defined, it is difficult to see how four of them could be performed in public in a nonobscene manner, but the fifth; *i.e.*, touching of oneself or another with or without clothing, certainly could.

This issue was addressed in *Ino Ino*. The analog to § IX(B) under discussion was Bellevue's BCC 5.08.070(F). In substance, the provisions are identical, and like its Spokane County counterpart, BCC 5.08.070(F) exempts nonobscene materials, but the exemption does not apply to acts described in § 7.48A.010(2)(b)(ii) & (iii), or to "conduct defined in BCC 5.08.010(N)." That subsection is the analog of Spokane County's § IV. With one exception, the two proscribe the same conduct. The exception is that in addition to prohibiting the touching of the sex organs or anus of oneself or another, the touching restriction in the Spokane County ordinance applies also to female breasts. As indicated, the Bellevue ordinance does not contain this restriction. **(Ct.Rec. 19, Ex. C, BCC 5.08.010(N)).** Neither does Federal Way's. **(Ct.Rec.19, Ex. F, § 9–71(L)).** Everett's does. **(Ct.Rec.19, Ex. M, § 1(L)).**

*Ino Ino* addressed the interplay between these sections in a truncated fashion:

> Finally, Respondents challenge BCC § 5.08.070(A)(5), which they argue prohibits nonobscene expression because the dramatic works exception, BCC § 5.08.070(F), is too narrow. The latter provision, however, excepts all conduct which is nonobscene from the prohibition in section 5.08.070(A)(5), and excludes from the exception only the obscene conduct described in RCW 7.48A.010(2)(b). Thus, contrary to Respondent's claim, BCC § 5.08.070(F) is valid because it prohibits only obscene expression.

132 Wash.2d at 137–38, 937 P.2d 154 (footnotes omitted).

BCC 5.08.070(F), like its Spokane County counterpart, prohibits obscene conduct proscribed by statute, but it also prohibits potentially nonobscene conduct described in BCC 5.08.010(N). BCC 5.08.070(A)(5) in turn renders unlawful "actual or simulated acts of sexual conduct as defined in this chapter, or any act which constitutes a violation of chapter 7.48A." This is couched in the disjunctive, and could be read to prohibit nonobscene conduct defined in BCC 5.08.010(N). That is exactly what we have here. How *Ino Ino* arrived at its conclusion without addressing or even citing BCC 5.08.010(N) is unclear, but the holding is unmistakable.

Two lessons emerge from the above-quoted passage. One is that with the exception of the ban on breast touching, the matter has been decided.[12] The second is

---

**11.** Plaintiff worries that because the ordinance prohibits "sexual conduct described" in the statute rather than sexual conduct which violates the statute, perhaps not all three *Miller* prongs must be met. See *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). The contention has been dealt with. Construing functionally identical language, *Ino Ino* held the provision "valid because it prohibits only obscene expression." *Ino Ino*, 132 Wash.2d at 138, 937 P.2d 154. *Ino Ino* necessarily read the provision as incorporating all three of the *Miller* prongs found elsewhere in § 7.48A.010(2).

**12.** The breast touching issue was not similarly decided in *Everett*. Plaintiff's privy raised the issue in the complaint. **(Ct.Rec.19, ex. N, § IV(2)(H)).** It is not clear why. Everett's exemption is broad, bans only conduct obscene under RCW ch. 7.48A, and does not purport to sweep in nonobscene conduct defined elsewhere in the ordinance. **(Ct.Rec.19, ex. M, § 12).** The same is true of Federal Way's enactment. **(Ct.Rec.19, ex. F, § 9–76).**

that while the abbreviated analysis in *Ino Ino* covering this topic may not appear to flow from the provisions under consideration, this is how *Ino Ino* had to construe them to uphold them as valid. Government can ban unprotected obscenity. Government can impose reasonable time, place and manner restrictions on protected expression. But government cannot regulate the content of nonobscene expression when viewed only by consenting adults. *BSA, Inc. v. King County*, 804 F.2d 1104, 1110 (9th Cir.1986). That is what the Spokane County ordinance may be read to do. Section IX(B) is constitutional only if limited to pure conduct and obscene expression. *O'Day v. King County*, 109 Wash.2d 796, 806, 749 P.2d 142 (1988).

It is important to note that *Ino Ino* did not hold that the exemption protects nonobscene *conduct*, but nonobscene *expression*. Nude dancing is protected under the First Amendment when seen as expression. *Kev, supra*, 793 F.2d at 1058. Nude dancing is not so protected when seen as pure conduct. "Where that expression is 'conduct' and not speech, 'the overbreadth of a statute must not only be real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep.'" *BSA, supra*, 804 F.2d at 1110 (emphasis original), citing *Broadrick v. Oklahoma*, 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

As confirmed by the surveillance tapes found at (**Ct.Rec. 19, Ex. E, files G & H**), the core of the ordinance is not directed to free speech, nor even commercial speech. It is conduct for sale. *County of King v. Chisman*, 33 Wash.App. 809, 813–14, 658 P.2d 1256, *review denied*, 99 Wash.2d 1018 (1983). Taking a cue from *Miller v. Reddin*, 422 F.2d 1264, 1265 (9th Cir.1970) (per curiam), the Court sees no utility in describing the content. This material

speaks for itself. It is not expression. *Key, supra*, drew the expression/conduct distinction. 793 F.2d at 1061. The message is protected; the medium is not. This "dancing" is conduct.

Finally, this construction is not inconsistent with § IX(B) when read in its entirety. The first part states that the ordinance does not apply to nonobscene material. The second part says that the exemption does not apply to obscene conduct and that it also does not apply to sexual conduct as defined in § IV. The final sentence goes on to provide that "Whether or not activity is obscene shall be judged by consideration of the standards set forth in RCW 7.48A.010(2)." The question is what purpose this final sentence is supposed to serve if it was not intended to play a limiting function. It must be assumed that the County wished to frame a regulatory scheme which is both workable and constitutional because if it is not constitutional, neither is it workable. With the exception of the panoram licensing issue, the County has accomplished that objective, subject to construing the dramatic works exemption carve-out to apply only to pure conduct without expressive value and to obscene expression.

With that observation comes a conceptual quagmire which many have attempted to wade through, but none altogether successfully.[13] "[N]ude dancing 'is expressive conduct within the outer perimeters of the First Amendment, though ... only marginally so.'" *Colacurcio, supra*, 944 F.Supp. at 1472, quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566, 111 S.Ct. 2456, 2460, 115 L.Ed.2d 504 (1991) (plurality). When conduct itself arguably becomes expression, where, how and by whom are the lines drawn? There is no

---

**13.** For the latest such effort in Washington State, see *DCR, Inc. v. Pierce County*, 92 Wash.App. 660, 964 P.2d 380 (1998). In upholding a ten–foot rule (far more stringent than the four–foot rule at issue here), *DCR* held that "proximity is not an expressive component of erotic dance entitled to protection under either the First Amendment or the State Constitution." *Id.* In considering what constitutes expression and restraint thereon, *DCR* focused on the expressor rather than the expressee. *Id.*

pat answer. The answers are found prosecution by prosecution, license revocation by license revocation, and case by case. Section IX(B) is valid as written. Whether it remains valid as enforced is up to the County.[14]

### III. Plaintiff's motion to Strike

Plaintiff moves to strike several paragraphs in the Declaration of Walker, as well as Exhibit A appended thereto, and also the Declaration of Captain Silver. Exhibit A is an illustrative summary of issues raised and decided in the various companion cases. Like any other illustrative summary, it is only as good as the underlying facts it purports to summarize, and that is all it has been relied upon for. To the extent Walker claims to have first hand knowledge of the companion litigation, the comments have been disregarded. If the record of the companion litigation lacks foundation (and that is doubtful), the Declaration of Smith has cured the defect. The Declaration of Silver is unobjectionable except for portions which lack foundation, and these have not been considered.

**IT IS HEREBY ORDERED:**

(1) Plaintiff's motion for partial summary judgment (**Ct.Rec.5**) is GRANTED in part and DENIED in part as provided in the text.

(2) Defendant's cross-motion for summary judgment (**Ct.Rec.17**) is GRANTED in part and DENIED in part as provided in the text.

(3) Plaintiff's motion to strike (**Ct. Rec.32**) is DENIED.

**IT IS SO ORDERED.** The District Executive is hereby directed to enter this Order and furnish copies to counsel.

---

**14.** This may be much ado about very little. Interrogatory 14 notwithstanding, the County has officially taken the position in its statement of facts that "the County does not construe Section IX(B)(3) to criminally prohibit certain non-obscene performances." (**Ct.Rec. 36, page 5**).